473 A.2d 155

William ·MATSKO

v.

HARLEY DAVIDSON MOTOR COMPANY, INC., Appellant,

v.

T.J. COSTELLA, Jr., and Uniontown Harley Davidson Company.

William MATSKO

v.

HARLEY DAVIDSON MOTOR COMPANY, INC.

v.

T.J. COSTELLA, Jr., and Uniontown Harley Davidson Company.

Appeal of UNIONTOWN HARLEY DAVIDSON COMPANY.

Superior Court of Pennsylvania.

Argued March 29, 1983.

Filed Feb. 24, 1984.

454

Herbert N. Rosenberg, Pittsburgh, for Harley Davidson, appellant (at No. 18) and appellee (at No. 67).

John Edward Wall, Pittsburgh, for Uniontown Harley, appellant (at No. 67) and appellee (at No. 18).

Sanford S. Finder, Washington, for Matsko, appellee.

Robert N. Clarke, Washington, for Costella, appellee.

Before CAVANAUGH, BROSKY and MONTGOMERY, JJ.

BROSKY, Judge:

This appeal is from judgment on the verdict in a civil case concerning a motorcycle accident. Plaintiff/appellee was the owner/rider of the vehicle and appellants are its manufacturer and seller. Appellants raise, collectively, 14 differ-

ent issues for our review. Seven of these are addressed substantively in the following opinion and in seven we rely upon the opinion of the court below. On all issues we hold in appellee's favor. Judgment is, accordingly, affirmed.

## Recall Notice

 Appellants contend that the trial court erred in admitting into evidence a post-accident recall notice of the motorcycle involved in the accident. It is argued that the "subsequent repair" rule forbids the admission of this evidence.[1] Looking to the rationale for that rule, we find it inapplicable to a products liability case.[2]

The principal reasons for excluding evidence of subsequent repair in a negligence case is that it is both irrelevant and prejudicial.

The negligence of the employer, which renders him responsible for the accident, depends upon what he did and knew before the accident, and must be established by facts and circumstances which preceded it, and not by acts done by him after the occurrence.

*Sappenfield v. Main St., etc. R.R. Co.*, 91 Cal. 48, 27 P. 590 at 593 (1891).

A more recent case restates the same rationale.

The reason for applying this rule of evidence to that kind of case is clear. Since at the heart of such an action is either affirmative conduct in creating a dangerous condition or a failure to perceive a foreseeable risk and take reasonable steps to avert its consequences, proof that goes to hindsight rather than foresight most often is entirely irrelevant and, at best, of low probative value.

---

1. With regard to this recall notice appellants also argue that a precautionary instruction was not given and that a foundation was not established showing that the defect which formed the basis of the recall notice was present in the vehicle involved in the accident. We find that the first issue was waived through failure to request it. As to the second issue, we find that a proper foundation was present.

2. The subsequent repair rule is Pennsylvania law. *Baran v. Reading Iron Co.*, 202 Pa. 274, 51 A. 979 (1902).

*Caprara v. Chrysler Corp.*, 52 N.Y.2d 114, 436 N.Y.S.2d 251 at 255, 417 N.E.2d 545 at 549 (1981.) [3]

Other courts have held, and we agree, that this rationale for excluding the evidence no longer applies in products liability cases where we "shift the emphasis from the defendant manufacturer's conduct to the character of the product." *Sutkowski v. Universal Marion Corp.*, 5 Ill. App.3d 313, 281 N.E.2d 749 at 753 (1972). In a products liability case our focus is on whether or not the product was in fact defective and not, as in a negligence case, on what the manufacturer knew or should have known about the defects in the product. Consequently, "At the very least, the balance that, in the traditional negligence cause, was weighted to avoid the prejudice rather than to find the relevancy is tipped the other way in a strict liability suit." *Caprara v. Chrysler Corp.*, supra, 436 N.Y.S.2d at 257, 417 N.E.2d at 551.

\* \* \*

The other justification for the subsequent repair rule is a public policy one. "Manufacturers should not be inhibited in, or prejudiced by, a good faith effort to protect the public safety and comply with their statutory duty." *Vockie v. General Motors Corp., Chevrolet Div.*, 66 F.R.D. 57 at 61 (E.D.Pa., 1975).[4] (*Vockie* involved the admissibility of a recall letter and the statutory duty referred to was the Federal law mandating the issuance of recall notices under certain circumstances.) [5] We find that this second rationale for the rule is also not applicable to a products liability

---

3. See also *Columbia & P.S.R. Co. v. Hawthorne*, 144 U.S. 202, 12 S.Ct. 591, 36 L.Ed. 321 (1892).

4. It appears that *Vockie* was a case brought in Federal court under diversity jurisdiction. However, the admissibility, *vel non*, of the recall notice was not treated as a substantive law issue, on which Pennsylvania law would govern. Rather, it was analyzed as a question of Federal procedure, to be governed by Federal evidentiary rules. As such, *Vockie* is not only not binding upon us, it is not even an interpretation of the law of this Commonwealth. Appellants' reliance on this case is misplaced.

5. 15 U.S.C.A. §§ 1398(a), 1402(a).

context. The federal and state courts of several jurisdictions have considered this question and, rather than reinvent the wheel, we will draw upon their analyses.

One of the earliest in this line of cases was out of the California Supreme Court—*Ault v. International Harvester Co.*, 13 Cal.3d 113, 117 Cal.Rptr. 812, 528 P.2d 1148 (1974). Though *Ault* dealt with subsequent remedial measures in general, and not with the particular subdivision of that category which concerns us here—a recall notice—its reasoning is well worth our attention.

While the provisions of section 1151 may fulfill this anti-deterrent function in the typical negligence action, the provision plays no comparable role in the products liability field. Historically, the common law rule codified in section 1151 was developed with reference to the usual negligence action, in which a pedestrian fell into a hole in a sidewalk (see e.g., *City of Miami Beach v. Wolfe* (Fla.1955) 83 So.2d 774) or a plaintiff was injured on unstable stairs (see e.g., *Hadges v. New York Rapid Transit Corporation* (1940), 259 A.D. 154, 18 N.Y.S.2d 304); in such circumstances, it may be realistic to assume that a landowner or potential defendant might be deterred from making repairs if such repairs could be used against him in determining liability for the initial accident.

When the context is transformed from a typical negligence setting to the modern products liability field, however, the "public policy" assumptions justifying this evidentiary rule are no longer valid. The contemporary corporate mass producer of goods, the normal products liability defendant, manufactures tens of thousands of units of goods; it is manifestly unrealistic to suggest that such a producer will forego making improvements in its product, and risk innumerable additional lawsuits and the attendant adverse effect upon its public image, simply because evidence of adoption of such improvement may be admitted in an action founded on strict liability for recovery on an injury that preceded the improvement. In

the products liability area, the exclusionary rule of section 1151 does not affect the primary conduct of the mass producer of goods, but serves merely as a shield against potential liability. In short, the purpose of section 1151 is not applicable to a strict liability case and hence its exclusionary rule should not be gratuitously extended to that field.

*Ault v. International Harvester Co., supra,* 117 Cal.Rptr. at 815–6, 528 P.2d at 1151–2.

An opinion from the Eighth Circuit restates this view [6] and goes on to give another reason specific to the recall context.

We believe that this reasoning is equally applicable here. Just as it is not reasonable to assume that manufacturers will forego improvements in products in order to avoid admission of the evidence of the improvements against them, it is not reasonable to assume that the manufacturers will risk wholesale violation of the National Traffic and Motor Vehicle Safety Act [16] and liability for subsequent injuries caused by defects known by them to exist in order to avoid the possible use of recall evidence as an admission against them. We find no error in the admission of these documents.

---

[16] Under 15 U.S.C. § 1398(a), violators of the National Traffic and Motor Vehicle Safety Act are subject to a civil penalty of up to $1,000

**6.** "We decline to follow the *Vockie* case. In *Robbins v. Farmers Union Grain Terminal Assn.,* 552 F.2d 788 (8th Cir.1977) this court held that the exclusionary rule governing subsequent remedial measures is inapplicable in a strict liability case because it serves no deterrent function. The reason for this decision is expressed by the South Dakota Supreme Court:

A products liability case looks to a defect in the product rather than any culpable act by the manufacturer. In an age of mass production it is not reasonable to assume that manufacturers would forego improvements in a product and subject themselves to mass liability for a defect just because evidence of an improvement is admissible in a pre-improvement liability case. The pure economics of the situation dictate otherwise. *Shaffer v. Honeywell, Inc., supra* [249 N.W.2d 251], at 257 n. 7 quoted in *Robbins v. Farmers Union Grain Terminal Assn., supra* at 793...."

*Farner v. Paccar,* 562 F.2d 518 at 527 (8th Cir., 1977).

for each violation with respect to each motor vehicle in issue, not to exceed $800,000, for any related series of violations.

*Farner v. Paccar, supra,* at 527.

Also referring to the statutory nature of recall notices is a case from New York.

As an additional answer to General Motors' public policy argument (that the admission of such recall letters would discourage manufacturers from announcing a possible defect), it is merely necessary to point out that such announcement was not a voluntary act, but one *mandated* by Federal statute.

*Barry v. Manglass,* 55 A.D.2d 1, 389 N.Y.S.2d 870 at 877 (S.Ct., 1976).

When the high court of that state spoke on this issue it referred to more factors.

Beyond that, the very economic realities that shaped these legal changes—among others, the growing market share of the mass manufacturer, the well-nigh universality of insurance, the escalation of governmental regulation—undermine any assumption that it is necessary to pay the price of sheltering defendants in strict products liability litigation from evidentiary use of their product changes in order to persuade them to make improvements to which self-interest must propel them in any event...

*Caprara v. Chrysler Corp., supra,* 436 N.Y.S.2d at 256, 417 N.E.2d at 550.

One writer also felt that "the liberalized scope of punitive damages awards" would also act to spur manufacturers to disclose defects notwithstanding the admissibility of such disclosures. John M. Kobayashi, Trial Law Guide (1981) at 321.

A law review article gives yet more reasons:

Moreover, the policy basis for excluding such evidence in negligence cases does not exist in strict liability cases where liability is imposed even though "the seller has exercised all possible care in the preparation and sale of his product." In today's world of competitive, consumer-oriented manufacturers, it is unreasonable to suggest

that admission of such evidence would discourage manufacturers from taking safety precautions and making post-accident improvements. In fact, in addition to humanitarian reasons, there are at least two compelling practical reasons why manufacturers are likely to take immediate safety precautions upon learning of existing defects. First, manufacturers realize that liability insurance companies will not continue to insure the further production of known defective products; as a condition of continuing the existing insurance coverage the manufacturer would be required by the liability insurance company to correct these defects. Second, manufacturers are well aware of the marketing impact which adverse publicity can have on future sales; and future sales will definitely take high priority over the payment by a manufacturer's insurance carrier of a damage suit judgment.

Davis, Evidence of Post-Accident Failures, Modifications and Design Changes in Products Liability Litigation, 6 St. Mary's L.J. 792 at 798–9 (1975) (footnote omitted).

One law review article went so far as to suggest that the admissibility of such evidence would encourage, rather than discourage remedial action.

The assumption that the admission of evidence of subsequent repairs discourages defendants from making required repairs may be erroneous. Manufacturers and distributors of mass-produced products may not be so callous to the safety of the consumer as the general exclusionary rule presumes. Furthermore, to the extent that admission of such evidence results in recovery by injured plaintiffs, it can be argued that evidence of subsequent repairs *encourages* future remedial action.

. . . . . .

Note, Products Liability and Evidence of Subsequent Repairs, 1972 Duke L.J. 837 at 848 (fns. omitted).

We find each of these several quotations persuasive. Cumulatively they constitute an overwhelming set of arguments in favor of the admissibility of the recall notice. We conclude, along with the Duke Law Journal author that:

Relevant evidence should not be excluded from a products liability case by an obsolete evidentiary rule when modern legal theories, accompanied by economic and political pressures, will achieve the desired policy goals.

Duke L.J., supra, at 850.

### Back Injury

The next issue involves a back injury which appellee alleged was the result of the motorcycle accident. Both appellants contend that the withdrawal of a juror and cautionary instructions should have followed argument and testimony on appellee's back injury and that their absence mandates a new trial.

They base this on the following rule of law. "Pennsylvania case law is clear that in a personal injury case when there is no obvious causal relationship between the accident and the injury, unequivocal medical testimony is necessary to establish the causal connection." *Albert v. Alter*, 252 Pa.Super. 203 at 224, 381 A.2d 459 at 470 (1977).

■ The back injury was introduced by appellee into the case at three points: in appellee's opening argument; in appellee's testimony; and in appellee's closing argument. Appellant's objected in a timely fashion at the opening argument. The issue is, therefore, preserved for our review in that instance.[7] However, appellants failed to object at the time of appellee's testimony or at the closing argument. As a consequence, this issue was not properly preserved in those contexts. *Dilliplaine v. Lehigh Valley Trust Co.*, 457 Pa. 255, 322 A.2d 114 (1974).

■ Of course, once an objection has been properly made, counsel is not obliged to repeatedly voice objections in a tendentious manner. However, counsel is required to repeat an objection when the grounds for it recur in separate

---

7. The other requirements for the preservation of issues for appellate review were also met.

phases of the trial.[8] This is required because the validity of an objection may change during the course of a trial.

This is precisely what occurred in the instant trial. While the trial court *did not* sustain the objection made to the opening argument—prefering to wait and see what evidence appellee could introduce to establish an "obvious causal relationship"—in its charge to the jury the trial court *did* specifically instruct them to disregard the back injury claim.

This procedural history raises a rather intricate question. Assuming, *arguendo*, that the trial court erred in not sustaining appellants' objection to the opening argument, did the charge cure that error so that appellants have no substantive issue on appeal?

In answering this question it is first necessary to note what type of error we are *not* treating. Some objections are to errors which are so "inflammable and prejudicial" that a cautionary instruction will not suffice. *Vereb v. Markowitz*, 379 Pa. 344 at 352, 108 A.2d 774 at 778 (1954). For this category of error a curative charge to disregard or even an immediate cautionary instruction are insufficient.[9] Here we are dealing with an error which, if it occurred at all, is undoubtedly not of an inflammable or dramatically prejudicial nature.

In its argument appellant Harley-Davidson includes the following quotation from a case of this Court.

The prejudicial comments once implanted in the minds of the jurors could be removed only by immediate cautionary instructions to the jury.

*Millen v. Miller*, 224 Pa.Super. 569 at 574, 308 A.2d 115 at 118 (1973). This isolated sentence would appear to answer

8. With what frequency an objection must be made during the same phase of a trial (as, for example, with different witnesses) is not before us and our remarks above should not be read to address that issue.

9. For this type of error the withdrawal of a juror, or possibly even the total cessation of the trial are required.

the question posed above in the negative. However, a careful reading of the entire passage in which the quoted sentence appears leads to a different conclusion.

Appellee argues that although the trial court did not so caution the jury, the error if there was one was cured by a comprehensive and adequate charge to the jury both on its duty to apply a reasonable man standard and as to its function in testing the credibility of witnesses. We do not agree. Plaintiff's counsel objected to counsel's closing argument immediately after the comments were made. The objections were specifically directed at the nature of the error. The prejudicial comments once implanted in the minds of the jurors could be removed only by immediate cautionary instructions to the jury. We do not believe that a charge of the court, absent specific cautionary instructions regarding error committed during the course of the trial, can adequately call the jury's attention to such error.

*Id.*

■■■ The law as we read it is as follows:

1. A general charge, correct in and of itself, but which does not include a specific cautionary reference to the prior error, *will not* serve to correct a trial court's error in not issuing a cautionary instruction at the time of the objection.

2. A charge which includes a specific instruction to disregard the matter objected to *can cure* the error committed in not issuing a cautionary instruction at the time of the objection.

■■■ Since the charge below did include a specific instruction to disregard the back injury claim, this case falls into the second of these two categories. The charge did cure the error, (if, indeed, there was any), in not issuing a cautionary instruction at the time of the objection. There is, thus, no need for us to determine if there was error

464

committed by the court below in not issuing such a cautionary instruction after the opening argument.[10]

## Rebuttal Testimony

■ Appellants claim that the trial court erred in not permitting rebuttal testimony by an expert witness, Mr. Minnert. Appellee's expert had testified that a prior accident on the same motorcycle was not causally related to the accident in question. Appellants wished to have their expert rebut this with testimony about undetectable damage. The trial court and the *en banc* court held that this was inadmissible as the proffered rebuttal testimony had not been revealed in discovery, pursuant to Pa.R.Civ.P. 4003.-5(c)[11]

"The admission of rebuttal evidence is normally within the discretion of the trial judge. *Flowers v. Green*, 420 Pa. 481, 218 A.2d 219 (1966)." *Mishkin v. Development Authority of City of Lancaster*, 6 Pa.Cmwlth. 97 at 101, 293 A.2d 135 at 137 (1972). Even if the trial court erred in this matter—and we do not hold that it did—the excluded testimony was not so critical as to warrant a new trial. "The grant or refusal of a new trial by the lower court will not be reversed by this Court in the absence of a clear abuse of discretion or an error of law *which controlled the outcome of the case ...*" *Menyo v. Sphar*, 409 Pa. 223 at 225, 186 A.2d 9 at 10 (1962).

10. We have already decided above that this matter could not have constituted an error of the dimensions which would mandate the withdrawal of a juror.

11. To the extent that the facts known or opinions held by an expert have been developed in discovery proceedings under subdivision (a)(1) or (2) of this rule, his direct testimony at the trial may not be inconsistent with or go beyond the fair scope of his testimony in the discovery proceedings as set forth in his deposition, answer to an interrogatory, separate report, or supplement thereto. However, he shall not be prevented from testifying as to facts or opinions on matters on which he has not been interrogated in the discovery proceedings.
Pa.R.Civ.P. 4003.5(c).

*Future Earning Capacity*

■ Appellants claim the trial court erred in charging the jury on appellee's loss of future earning capacity. When the underbrush of verbiage is cleared away, appellants can be seen to be challenging the lack of unequivocal expert testimony relating appellee's injuries to a loss of earning capacity.[12] But, while admissible, expert testimony is not required to show loss of earning capacity. *Gary v. Mankamyer,* 485 Pa. 525, 403 A.2d 87 (1979).[13]

Judgment on the verdict is affirmed.

CAVANAUGH, J., notes his dissent.

12. This is so because there was sufficient testimony by appellee and one of his co-workers to support the charge.

13. We find that the other issues were properly disposed of in appellee's favor by the court below on well-established principles of law. Accordingly, we will not address them in this published opinion. Those issues are: excessive verdict; remarks made on the witness stand by appellant, appellant's sister, an ambulance attendant and appellant's expert witness; and appellant Uniontown Harley-Davidson's claim for indemnity from appellant Harley-Davidson.